1
2
3
4
5
6
7

8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10   ARTHUR DIAMOND,

11            Plaintiff,                    No. CIV S-09-1110 MCE DAD PS

12        v.

13   STATE FARM MUTUAL
     AUTOMOBILE INSURANCE
14   COMPANY, et al.,                       FINDINGS AND RECOMMENDATIONS

15            Defendants.

16   _____/

17            This matter came before the court for hearing of defendant State Farm Mutual

18   Automobile Insurance Company's amended motion for summary judgment (Doc. No. 80),

19   defendant Mediterranean Shipping Company's motion to dismiss plaintiff's complaint for lack of

20   subject matter jurisdiction, or in the alternative for partial summary judgment, (Doc. No. 104),

21   and defendant CSE Insurance Group's motion to dismiss plaintiff's complaint for lack of subject

22   matter jurisdiction, or in the alternative for summary judgment.  (Doc. No. 113.)

23            Attorney Stephen M. Hayes appeared on behalf of defendant State Farm Mutual

24   Automobile Insurance Company ("State Farm") at the October 25, 2010 hearing on State Farm's

25   motion for summary judgment.  Attorney Mark de Langis appeared on behalf of defendant

26   Mediterranean Shipping Company ("MSC") at the February 11, 2011 hearing on MSC's motion

                                              1

1     to dismiss, or in the alternative for partial summary judgment.  Attorney Devera Petak appeared

2     on behalf of defendant CSE Insurance Group ("CSE") at the April 1, 2011 hearing on CSE's

3     motion to dismiss, or in the alternative motion for summary judgment.  Plaintiff Arthur

4     Diamond, proceeding pro se, appeared on his own behalf at each hearing.  Oral argument was

5     heard, and defendants' motions were thereafter taken under submission.

6                                  BACKGROUND

7           Plaintiff originally commenced this action by filing a complaint in the Sacramento

8     County Superior Court on January 12, 2009.  (Doc. No. 2 at 4.)  On April 21, 2009, defendant

9     MSC removed the action to this court pursuant to 28 U.S.C. § 1441(a).  (Doc. No. 1.)  On April

10    27, 2009, defendant MSC filed an answer, (Doc. No. 9), and on April 29, 2009, the undersigned

11    issued a scheduling order.  (Doc. No. 10.)

12           On May 7, 2009, defendant State Farm filed a motion to dismiss plaintiff's second

13    cause of action.  (Doc. No. 14.)  On May 15, 2009, plaintiff filed a motion to remand this matter

14    back to state court pursuant to 28 U.S.C. § 1446.  (Doc. No. 18.)  On June 5, 2009, defendant

15    MSC filed an opposition to plaintiff's motion to remand.  (Doc. No. 20.)

16           On March 31, 2010, the undersigned issued findings and recommendations

17    recommending that plaintiff's motion to remand this action to state court be granted.  (Doc. No.

18    58.)  On April 14, 2010, defendant MSC filed objections to those findings and recommendations,

19    raising new arguments not originally presented in opposition to the motion.  (Doc. No. 60.)  On

20    April 29, 2010, defendant State Farm filed a motion for summary judgment.  (Doc. No. 62.)  On

21    July 26, 2010, the undersigned vacated the March 31, 2010 findings and recommendations, and

22    issued new findings and recommendations, recommending that plaintiff's May 15, 2009 motion

23    for remand be denied and that defendant State Farm's May 7, 2009 motion to dismiss plaintiff's

24    second cause of action be granted.  (Doc. No. 75.)  Those findings and recommendations were

25    adopted by the assigned District Judge on August 26, 2010.  (Doc. No. 78.)

26    /////

1    On August 30, 2010, the court issued a second amended pretrial scheduling order.

2  (Doc. No. 79.)  On September 14, 2010, defendant State Farm filed an amended motion for

3  summary judgement which is now pending before the court.  ("State Farm MSJ" (Doc. Nos. 63

4  and 80.))[1]  Plaintiff filed a belated opposition to that motion on October 27, 2010.  ("Pl's Opp.'n.

5  to State Farm" (Doc. No. 93.))  Defendant State Farm filed a reply on November 5, 2010.  ("State

6  Farm Reply" (Doc. No. 95.))  Plaintiff filed an unauthorized response to defendant State Farm's

7  reply on November 29, 2010.[2]  (Doc. No. 101.)

8    On January 10, 2011, defendant MSC filed a motion to dismiss for lack of subject

9  matter jurisdiction, or alternatively for partial summary judgement.  ("MSC MTD" (Doc. No.

10  104.))  That motion is also now pending before the court.  Plaintiff filed an opposition to that

11  motion on February 10, 2011.  ("Pl's Opp'n. to MSC" (Doc. No. 111.))  MSC did not file a reply.

12    On February 28, 2011, defendant CSE filed a motion to dismiss or alternatively

13  for partial summary judgement which is also now pending before the court.  ("CSE MSJ" (Doc.

14  No. 113.))  Plaintiff filed an opposition to CSE's motion on March 21, 2011.  ("Pl's Opp'n. to

15  CSE" (Doc. Nos. 115 and 116.))  Defendant CSE filed a reply on March 22, 2011.  ("CSE

16  Reply" (Doc. No. 114.))

17  /////

18  /////

19

20    [1] Defendant State Farm's September 14, 2010 amended motion for summary judgement
is based on the documents filed in support of their April 29, 2010 motion for summary judgment.
(See Doc. No. 80.)

21

22    [2] Defendant State Farm has objected to plaintiff's unauthorized response.  (Doc. No.
102.)  Plaintiff is again advised that the proper briefing of a motion in this court consists of the

23  moving party's motion, the responding party's opposition or statement of non-opposition, and the
moving party's optional reply to opposition.  Local Rule 230(b)-(d).  The rule does not authorize

24  the filing of a response to a reply.  The court is not required to consider plaintiff's unauthorized
response to defendant's reply.  In light of plaintiff's pro se status, the undersigned will consider

25  his response in this instance.  Unauthorized briefing shall not be filed in the future except with
leave of court.  Leave may be sought by filing an application for leave to submit supplemental

26  briefing.  Such an application will be denied absent a showing of good cause for the party's
failure to include all arguments in the briefing permitted by Local Rule 230 (b)-(d).

1              PLAINTIFF'S CLAIMS

2              In his complaint plaintiff alleges as follows.  In 2006 plaintiff contacted Charles

3    Boateng, who had claimed to be a shipping agent for Transglobal International Shipping

4    ("Transglobal").  Plaintiff sought the services of Transglobal to ship plaintiff's 1999 Mercedes

5    Benz ML320, loaded with plaintiff's personal property, to Kampala, Uganda.  On September 3,

6    2006, plaintiff turned his vehicle and its contents over to Boateng for shipment.  The following

7    day plaintiff attempted to contact Boateng by telephone but received no response.  At some point,

8    plaintiff reported to defendant State Farm, the issuer of plaintiff's automobile insurance policy,

9    and defendant CSE, the issuer of plaintiff's homeowners insurance policy, that Boateng had

10   stolen plaintiff's vehicle and its contents.  Plaintiff also filed a loss report with the Elk Grove

11   Police Department, in Elk Grove, California.

12             In October of 2006, the Elk Grove Police Department informed plaintiff and

13   defendant State Farm that they had reliable information that a vehicle fitting the description of

14   plaintiff's vehicle was located at the Houston office of defendant MSC.  Defendant MSC

15   provides international shipping services.  When contacted by the police, defendant MSC refused

16   to cooperate with the investigation by the Elk Grove Police Department.

17             Eventually, Mr. Herve Torlotting, a deputy office manager at MSC's office in

18   Houston, Texas, acknowledged that his records reflected that MSC had a container that

19   apparently contained plaintiff's vehicle, although Torlotting could not be certain, since the

20   shipping containers are delivered to MSC sealed and are not opened or inspected.  Torlotting,

21   however, refused to release the container to anyone other then the possessor of the original bill of

22   lading, which was given to Boateng.  Torlotting eventually allowed the container to be shipped to

23   Dar Es Salaam, Tanzania.

24             In the meantime, defendant State Farm notified plaintiff that State Farm would not

25   pay a claim based on the loss of his vehicle because the vehicle was shipped overseas and

26   vehicles located outside the United States are excluded from coverage under plaintiff's

1  automobile insurance policy.  Similarly, defendant CSE notified plaintiff that they were refusing

2  to pay his claim based upon the loss of his personal property loaded inside the vehicle, because

3  plaintiff's homeowners insurance policy did not cover items stolen from inside a vehicle and

4  because plaintiff's initial loss report to the Elk Grove Police Department did not mention any

5  personal property inside the vehicle.  Edmond Wade, a private attorney retained by State Farm,

6  later contacted plaintiff and informed him that an investigator for State Farm had located his

7  vehicle in a shipping container in Dar Es Salaam at a shipping yard operated by MSC.  Plaintiff

8  thereafter contacted the International Criminal Police Organization ("INTERPOL").

9         INTERPOL contacted the manager of MSC's Dar Es Salaam shipping yard, but

10  the manager refused to release the shipping container without authorization from MSC's

11  headquarters, located in Geneva, Switzerland.  Plaintiff's repeated attempts to obtain his

12  possessions from MSC were unsuccessful.  Plaintiff expended considerable effort and costs in

13  attempting to recover his possessions and suffered over $186,000 in property loss.

14         Based on these factual allegations, plaintiff raises claims for breach of contract,

15  professional negligence, breach of the implied covenant of good faith and fair dealing[3], and the

16  intentional infliction of emotional distress.  Plaintiff seeks compensatory and punitive damages

17  in excess of $276,000.  (Notice of Removal, ("Compl." (Doc. No. 2), at 5-27.)[4]

18                    DEFENDANTS' MOTIONS

19         Defendants MSC and CSE have brought motions to dismiss pursuant to Rule

20  12(b)(1) of the Federal Rules of Civil Procedure.  Defendants MSC, CSE and State Farm have

21  also moved for summary judgment in their favor.  The court will first address motions to dismiss

22

23      [3]  Plaintiff's third cause of action is entitled "Causing Financial Loss."  (Compl. (Doc.
    No. 2) at 21.)  However a reading of the allegations of the complaint reveals that this claim is
24  more accurately described as a claim for the breach of the implied covenant of good faith and fair
    dealing or for so-called "bad faith."

25

26      [4]  Page number citations such as this one are to the page number reflected on the court's
    CM/ECF system and not to page numbers assigned by the parties.

1  brought pursuant to Rule 12(b)(1) by defendants MSC and CSE before turning to the defendants'

2  motions for summary judgment.

3  I.  Motions to Dismiss Pursuant to 12(b)(1)

4       A.  Legal Standards

5            Federal Rule of Civil Procedure 12(b)(1) allows a defendant to raise by motion the

6  defense that the court lacks jurisdiction over the subject matter of an entire action or over specific

7  claims.  "A motion to dismiss for lack of subject matter jurisdiction may either attack the

8  allegations of the complaint or may be made as a 'speaking motion' attacking the existence of

9  subject matter jurisdiction in fact."  Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp., 594 F.2d

10  730, 733 (9th Cir. 1979).

11           When a party brings a facial attack to subject matter jurisdiction, the issue is

12  whether the allegations of jurisdiction contained in the complaint are insufficient on their face to

13  demonstrate the existence of jurisdiction.  Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039

14  (9th Cir. 2004).  In a Rule 12(b)(1) motion of this type, the plaintiff is entitled to safeguards

15  similar to those applicable when a Rule 12(b)(6) motion is made.  See Sea Vessel Inc. v. Reyes,

16  23 F.3d 345, 347 (11th Cir. 1994); Osborn v. United States, 918 F.2d 724, 729 n. 6 (8th Cir.

17  1990).  The factual allegations of the complaint are presumed to be true, and the motion is

18  granted only if the plaintiff fails to allege an element necessary for subject matter jurisdiction.

19  Savage v. Glendale Union High Sch. Dist. No. 205, 343 F.3d 1036, 1039 n. 1 (9th Cir. 2003),

20  Miranda v. Reno, 238 F.3d 1156, 1157 n. 1 (9th Cir. 2001).  Nonetheless, district courts "may

21  review evidence beyond the complaint without converting the motion to dismiss into a motion

22  for summary judgment" when resolving a facial attack.  Safe Air for Everyone, 373 F.3d at 1039.

23           Alternatively, when a Rule 12(b)(1) motion attacks the existence of subject matter

24  jurisdiction in fact, no presumption of truthfulness attaches to the plaintiff's allegations.  Safe Air

25  for Everyone, 373 F.3d at 1039; Thornhill Publ'g Co., 594 F.2d at 733.  Under such a factual

26  attack, the "dispute [concerns] the truth of the allegations that, by themselves, would otherwise

6

1   invoke federal jurisdiction." <u>Safe Air for Everyone</u>, 373 F.3d at 1039.  In the case of such a

2   factual attack, "the district court is not restricted to the face of the pleadings, but may review any

3   evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of

4   jurisdiction." <u>McCarthy v. United States</u>, 850 F.2d 558, 560 (9th Cir. 1988).  When deciding a

5   factual challenge to subject matter jurisdiction, the court may only rely on facts that are not

6   intertwined with the merits of the action.  <u>Safe Air for Everyone</u>, 373 F.3d at 1039.  Finally,

7   when a Rule 12(b)(1) motion attacks the existence of subject matter jurisdiction in fact, plaintiff

8   has the burden of proving that jurisdiction does in fact exist.  <u>Thornhill Publ'g Co.</u>, 594 F.2d at

9   733.[5]

10        B.  <u>Defendant MSC's Motion to Dismiss</u>

11            Defendant MSC seeks dismissal of plaintiff's claims pursuant to Federal Rule of

12   Civil Procedure 12(b)(1) on the ground that the court lacks subject matter jurisdiction over this

13   action. Specifically, defendant MSC argues that plaintiff's claims are time barred by the one-year

14   statute of limitations contained in the Carriage of Goods By Sea Act ("COGSA").  In this regard,

15   counsel for defendant MSC contends that plaintiff's possessions were discharged and available

16   for delivery in Dar Es Salaam as of January 1, 2007.  Moreover, defense counsel argues, the

17   MSC bill of lading obligated plaintiff to file suit within one-year after the date that his goods

18   should have been delivered.[6]  (Def. MSC's Mem. of P. & A. (Doc. No. 104) at 8-10.)

19            In opposing defendant's motion to dismiss plaintiff argues that: 1) defendant MSC

20   was not even sure of the location of plaintiff's goods as of April of 2008; 2) defendant knowingly

21   and willfully participated in defrauding plaintiff; and 3) despite plaintiff's repeated attempts,

22
23        [5]  Although neither defendant MSC or defendant CSE have identified the specific nature
     of their jurisdictional attack, resolution of defendants' motions is unaffected by their failure to do
24   so.

25        [6]  The court finds this argument by defendant MSC perplexing, since it cannot be disputed
     that plaintiff himself did not arrange for the shipment of his possessions by MSC and did not
26   receive a copy of the MSC bill of lading until well after those possessions should have been
     delivered.

1  defendant MSC refused to surrender plaintiff's possessions to him before ultimately turning them

2  over for auction.  (Pl.'s Opp.'n. to MSC (Doc. No. 111) at 2-33.)

3         COGSA applies to "[e]very bill of lading . . . which is evidence of a contract for

4  the carriage of goods by sea to or from ports of the United States, in foreign trade . . . ."  Note

5  following 46 U.S.C. § 30701.  "The time bar provisions in COGSA state that: '[i]n any event the

6  carrier and the ship shall be discharged from all liability in respect of loss or damage unless suit

7  is brought within one-year after delivery of the goods or the date when the goods should have

8  been delivered.'"  Underwood Cotton Co., Inc. v. Hyundai Merchant Marine (American), Inc.,

9  288 F.3d 405, 408 (9th Cir. 2002) (quoting 46 U.S.C. app. § 1303(6)).[7]

10         "The cases discussing the meaning of 'delivery' under the COGSA have held that

11  'delivery' occurs upon notification of the consignee that the goods arrived and after a reasonable

12  opportunity for the consignee to obtain or inspect the goods."  Starrag v. Maersk, Inc., 486 F.3d

13  607, 617 (9th Cir. 2007).  See also The Eddy, 72 U.S. 481, 495 (1866) (holding that actual

14  delivery to the owner is not required and that valid delivery occurs where the shipper gave due

15  and reasonable notice to consignee affording him a fair opportunity to remove the goods); The

16  Tangier, 64 U.S. 28, 39 (1859) (holding that the cargo is delivered once due and reasonable

17  notice is given to the consignee such that the consignee has a fair opportunity to arrange for

18  proper care and custody of the goods); Servicios-Expoarma v. Indus. Mar. Carriers, Inc., 135

19  F.3d 984, 992 (5th Cir. 1998) ("'Delivery' occurs when the carrier places the cargo into the

20  custody of whomever is legally entitled to receive it from the carrier"); Metro. Wholesale Supply,

21  Inc. v. M/V Royal Rainbow, 12 F.3d 58, 61 (5th Cir. 1994) (deciding that "proper delivery"

22  occurs when the consignee has notice of arrival and a reasonable opportunity to pick up the

23  goods); Capital Partners Int'l Ventures, Inc. v. Danzas Corp., 309 F. Supp.2d 1138, 1146 (N.D.

24  Cal. 2004) (discussing constructive delivery of cargo under both the Harter Act and COGSA,

25

26         [7]  Congress recodified COGSA on October 6, 2006, and COGSA is now included as a
   note to 46 U.S.C. § 30701.

1  concluding that "[g]oods are constructively delivered once they are placed upon a fit wharf and

2  the consignee receives both due and reasonable notice that the goods have been discharged and a

3  reasonable opportunity to remove them"); National Packaging Corp. v. Nippon Yusen Kaisha,

4  354 F. Supp. 986, 987 (N.D. Cal. 1972) (a consignee should receive notice of discharge and "a

5  reasonable opportunity to remove the goods or place them under proper care and custody").

6        The undisputed evidence before the court establishes that MSC transported

7  plaintiff's possessions in a container from Houston, Texas on November 4, 2006, to Dar Es

8  Salaam, Tanzania on January 1, 2007.  (Torlotting Decl. Part 1 (Doc. No. 107) at 2-4.)  On

9  October 31, 2007, MSC's agent Herve Torlotting e-mailed plaintiff and informed him that his

10 possessions were in a sealed container in Dar Es Salaam and that plaintiff should contact the

11 MSC shipping yard there "to get more info on what needs to be done to get the cargo released."

12 (Torlotting Decl. Part 1 (Doc. No. 107) at 4; Torlotting Decl. Part 2 (Doc. No. 108) at 7.)  On

13 November 9, 2007, plaintiff emailed Torlotting, thanking him for the information provided,

14 asking for the storage and customs charges with respect to his possessions and for a copy of the

15 bill of lading.  (Torlotting Decl. Part 2 (Doc. No. 108) at 3.)

16        Sometime thereafter plaintiff emailed a person named Shirima in Dar Es Salaam,

17 indicating that plaintiff was given Shirima's name by Torlotting.[8]  (de Langis Decl. (Doc. No.

18 106) at 49.)  Plaintiff asked Shirima to confirm that plaintiff's vehicle was inside the container

19 and to provide plaintiff with the applicable port and customs charges.  (Id.)  Shirima responded

20 that the container arrived in Dar Es Salaam on January 1, 2007, and that no original bill of lading

21 had been presented for release of the contents of the container.  (Id. at 48-49.)  Shirima also

22 provided an estimate of the storage and customs charges.  (Id.)

23 /////

24 /////

25

26 [8] There are no dates indicated with respect to these email exchanges between plaintiff
   and Shirima.

Plaintiff replied to Shirima, stating:

> In your email you did not state that you have looked in that container and confirmed that my vehicle is inside.  Remember I did not ship the container and I am not responsible for it.  Mr. Torlotting, the MSC manager in Houston believes that my vehicle is in that container.  Someone obviously was attempting to divert it and steal it.  As such, you don't expect me to pay for storage charges for the thief who tried to steal the car.  So, I need to negotiate with you the release of the vehicle and anything else that belongs to me but I am not responsible for the container as I explained to Mr. Torlotting because I did not ship it.

(Id. at 48.)

Shirima responded, thanking plaintiff for his email message and stating:

> First of all, once a container is discharged/landed here from ship it is placed under the custody of the landing contractor (in this case the port container terminal operator) pending customs clearance and delivery of the cargo by the consignee.  As shipping agents we are not allowed access to the container at any intermediate stage to establish position of contents there in.  As I told you earlier since arrival of this container no one has presented original bills of lading to us for release of the cargo and therefore the container is deemed to be full in port, apparently with contents thereof intact.
>
> Notwithstanding circumstances that may have led to the correct or incorrect shipment of the container from USA to Dar Es Salaam port, as agents for the carrier we will handle this matter strictly within the terms of the bill of lading unless there is a court order from Dar Es Salaam court that directs MSC to act otherwise.  In any case MSC is an innocent carrier and is not party to whatever theft that may have taken place in USA, leading to the shipment of the subject cargo to Dar Es Salaam.
>
> Since you do not seem to possess original bills of lading covering this cargo you are advised to take unilateral legal recourse seeking a court order for release of the cargo in your favor having satisfied the court that you are a bonafide owner of the same.
>
> FYI MSC will not involve itself to such proceedings.  Do not hesitate to contact us here in Dar Es Salaam or our principals in Geneva for further clarification.

(Id.)

On December 12, 2007, plaintiff sent a lengthy email to Shirima, Torlotting and one "M Waclawek USNYC CLAIMS ASST MGR," saying that he was getting "very frustrated"

1   with a perceived lack of communication between Shirima and Torlotting.  Plaintiff went on to

2   state that:

3          MR. TORLOTTING SHOULD HAVE COMMUNICATED TO
           YOU THAT IT IS MY VEHICLE IN THAT CONTAINER.  HE
4          KNOWS THAT!  HE HAS TOLD BOTH ME AND STATE
           FARM INSURANCE THAT IT IS MY VEHICLE IN THAT
5          CONTAINER.  SO, THERE IS NO SENSE IN SAYING THAT
           YOU DO NOT KNOW WHO THE OWNER IS AND THAT I
6          SHOULD GET A COURT ORDER IN DAR ES SALAAM.

7                                    ***

8          If you do not release my vehicle and other belongings soon, I will
           take the following steps:

9
           1. I will file a court order in Sacramento, California ... requesting
10         that MSC return my vehicle and other property to Elk Grove, CA.,
           and
11
           2. I will write a letter to the U.S. State Department requesting a full
12         investigation of MSC and its activities in shipping vehicles outside
           the USA.  It appears MSC's profit motive supersedes its moral and
13         ethical obligations; if indeed it is determined that MSC tries to
           benefit economically even after determining who the rightful
14         owner of the goods shipped is; given that many U.S. citizens are
           getting their vehicle and other goods stolen and shipped overseas.
15         The Elk Grove Police Department has informed me that the State
           Department is currently compiling data to ascertain these thefts and
16         determine to what extent the shipping companies are involved;

17         3.  In the alternative I will file a court order in Houston, TX to
           request that the goods be shipped back to the port in Houston.
18
           I DO NOT EXPECT ANY MORE HASSLES FROM YOU IN
19         RELEASING MY VEHICLE AND PROPERTY AND I AM NOT
           IN ANY WAY PLEASED WITH THE SERVICE I AM
20         GETTING IN TRYING TO DETERMINE WHETHER MY
           VEHICLE IS STILL IN THAT CONTAINER IN DAR ES
21         SALAAM SO THAT I CAN RELEASE STATE FARM FROM
           ITS INSURANCE RESPONSIBILITY.
22

23   (Id. at 46-47.)

24          Plaintiff ultimately filed this civil action in the Sacramento County Superior Court

25   in January of 2009.  There is no evidence before the court indicating that plaintiff ever obtained,

26   /////

                                        11

1  or attempted to obtain, a court order in Dar Es Salaam ordering MSC to release plaintiff's vehicle

2  and personal property to him.

3          Based on this evidence it is clear that as of November 9, 2007, at the latest,

4  plaintiff was aware that his goods had been discharged in Dar Es Salaam and were waiting to be

5  claimed via the proper legal channels.  Thus, plaintiff's goods were constructively delivered by

6  MSC, at the very latest, as of November 9, 2007.  See Danzas, 309 F. Supp.2d at 1146 ("Goods

7  are constructively delivered once they are placed upon a fit wharf and the consignee receives

8  both due and reasonable notice that the goods have been discharged and a reasonable opportunity

9  to remove them.")

10          While plaintiff argues that MSC's refused to confirm that his possessions were in

11  the container and to release his possessions to him without an original bill of lading or Dar Es

12  Salaam court order, plaintiff was well aware of these issues by December of 2007.  Nonetheless,

13  plaintiff did not file suit in the Sacramento County Superior Court until January 9, 2009, after

14  COGSA's one-year statute of limitations for the filing of an action had expired.

15          Accordingly, defendant MSC's motion to dismiss for lack of subject matter

16  jurisdiction based upon the applicable statute of limitations should be granted.[9]

17      C.  Defendant CSE's Motion

18  _____ Defendant CSE seeks dismissal of plaintiff's claims pursuant to Federal Rule of

19  Civil Procedure 12(b)(1) on the ground that the court lacks subject matter jurisdiction.

20  Specifically, counsel for defendant CSE argues that plaintiff's claims are time barred under the

21  terms of his homeowners insurance policy with CSE, which provided that plaintiff must file suit

22  within one-year after the date his loss claim was denied.  In this regard, counsel for CSE

23  contends that on August 14, 2007, plaintiff was notified in writing that CSE was "not in the

24

25          [9] In light of this recommendation, the undersigned need not address defendant MSC's
    alternative argument for partial summary judgment under Federal Rule of Civil Procedure 56(a)
26  based on the ground that COGSA limits MSC's liability to $500.

1  position to resolve or settle" plaintiff's claim.  Defendant CSE contends that plaintiff interpreted

2  CSE's statement as a denial which triggered the running of the one-year statute of limitations.

3  Because plaintiff did not file this action until January of 2009, CSE contends that plaintiff's

4  claims are barred by the one-year statute of limitations found in his homeowners insurance

5  policy.  (Def. CSE's Mem. of P. & A. (Doc. No. 113) at 15-16.)

6          Plaintiff opposes defendant's motion, arguing that the August 14, 2007 letter did

7  not deny plaintiff's loss claim but merely notified plaintiff that CSE needed more time to

8  investigate.  Moreover, plaintiff asserts that he called the CSE Claims Department several times

9  after he received the August 14, 2007 letter inquiring about the status of his claim and was

10  repeatedly told that CSE was still investigating the claim.  (Pl.'s Opp.'n. to CSE (Doc. No. 115)

11  at 4-5.)

12          Defendant CSE's argument in this regard is unpersuasive.  The August 14, 2007

13  letter from CSE to plaintiff clearly stated:

14          We are in receipt of your letter dated July 20, 2007, and we
          appreciate your patience *as we continue to investigate your claim*.

15          Although we are empathetic to your concerns for resolving this
          matter as expeditiously as possible, we are not in the position to

16          resolve or settle your claim.

17                                          ***

18          We will continue to verify all leads and information that has been
          presented regarding this claim and will keep you updated on our

19          progress as it becomes available.

20  (Taylor Decl., Ex. C (Doc. No. 113-4) at 34) (emphasis added).  No rational person would

21  interpret the statement "as we continue to investigate your claim" as a denial of their loss claim.

22  (Id.)

23  /////

24  /////

25  /////

26  /////

1    Moreover, defendant CSE concedes that the applicable one-year statute of

2 limitations does tolled from the time the insured provides notice of the loss until there is a formal

3 denial of plaintiff's loss claim.[10]  (Def. CSE's Mem. of P. & A. (Doc. No. 113) at 15.)  See also

4 Prudential-LMI Com. Insurance v. Superior Court, 51 Cal.3d 674, 693 (Cal. 1990) ("We

5 conclude that proper resolution . . . is to allow the one-year suit provision . . . to run from the date

6 of "inception of loss," . . . but to toll it from the time an insured gives notice of the damage to his

7 insurer").  Here, plaintiff has alleged that: 1) the inception of loss occurred when Boateng stole

8 his personal property in September of 2006; 2) that plaintiff reported his loss to CSE in May of

9 2007; and 3) that CSE continued to tell plaintiff that they were in the process of investigating his

10 loss claim.  Defendant CSE argues that plaintiff acknowledged at his deposition that he

11 interpreted the August 14, 2007 letter from Taylor as a denial of his loss claim.  (Id. at 15-16.)

12 However, defendant has failed to cite any evidence before the court in support of that assertion.[11]

13 Moreover, plaintiff disputes CSE assertion in this regard, characterizing it as "false."  (Pl.'s

14 Opp.'n. to CSE (Doc. No. 115) at 19.)

15    Accordingly, for the reasons stated above, defendant CSE's motion to dismiss for

16 lack of subject matter jurisdiction based on statutes of limitations grounds should be denied.

17 /////

18 /////

19 /////

20

21    [10]  Neither plaintiff nor defendant CSE has alleged, nor pointed to any evidence
suggesting,  that CSE ever issued a formal denial of plaintiff's loss claim on any specific date.

22

23    [11]  The court notes that defendant CSE attached only copies of excerpts from plaintiff's
February 24, 2010 and March 30, 2010 depositions to the declaration of Devera L. Petak filed
with the court.  (See Doc. No. 113-3.)  Moreover, several pages of the excerpts are rendered

24 partially or totally illegible as a result of what appears to be the highlighting of the original.  In
any event, Local Rule 133(j), requires that a party citing to deposition testimony provide the

25 court with a courtesy copy, in either paper or electronic format, of the entire deposition relied
upon.  Defendant CSE has failed to do so and its motion, in this regard, lacks evidentiary

26 support.

1  II.  Motions for Summary Judgment

2      A.  Legal Standards

3          Summary judgment is appropriate when it is demonstrated that there exists no

4  genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

5  of law.  Fed. R. Civ. P. 56(c).  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970);

6  Owen v. Local No. 169, 971 F.2d 347, 355 (9th Cir. 1992).

7          A party moving for summary judgment always bears the initial
           responsibility of informing the district court of the basis for its
8          motion, and identifying those portions of "the pleadings,
           depositions, answers to interrogatories, and admissions on file,
9          together with the affidavits, if any," which it believes demonstrate
           the absence of a genuine issue of material fact.

10

11  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

12          "[W]here the nonmoving party will bear the burden of proof at trial on a

13  dispositive issue, a summary judgment motion may properly be made in reliance solely on the

14  'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Celotex Corp., 477

15  U.S. at 323.  Indeed, summary judgment should be entered, after adequate time for discovery and

16  upon motion, against a party who fails to make a showing sufficient to establish the existence of

17  an element essential to that party's case, and on which that party will bear the burden of proof at

18  trial.  See id. at 322.

19          "[A] complete failure of proof concerning an essential element of the nonmoving

20  party's case necessarily renders all other facts immaterial."  Id.  Summary judgment should then

21  be granted, "so long as whatever is before the district court demonstrates that the standard for

22  entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

23          If the moving party meets its initial responsibility, the burden then shifts to the

24  opposing party to establish that a genuine issue as to any material fact actually does exist.  See

25  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to

26  establish the existence of this factual dispute, the opposing party may not rely upon the

1    allegations or denials of its pleadings but is required to tender evidence of specific facts in the

2    form of affidavits, and/or admissible discovery material, in support of its contention that the

3    dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n. 11.  The opposing party

4    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

5    of the suit under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

6    (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

7    1987).  The opposing party must also demonstrate that the dispute is genuine, i.e., that the

8    evidence is such that a reasonable jury could return a verdict for the nonmoving party.  See Wool

9    v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

10           To establish the existence of a factual dispute, the opposing party need not

11   establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

12   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

13   trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

14   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

15   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

16   amendments).

17           In resolving the summary judgment motion, the court examines the pleadings,

18   depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

19   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

20   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

21   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

22   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

23   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

24   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

25   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

26   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

16

1  as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

2  'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

3      B.  <u>Defendants' Statement of Undisputed Facts and Evidence</u>[12]

4          Defendants' statement of undisputed facts is supported by several declarations

5  signed under penalty of perjury, as well as voluminous documentary evidence.

6          The evidence submitted by the defendants establishes the following.  On

7  September 3, 2006, plaintiff picked up Boateng from the Sacramento International Airport and

8  the two traveled to plaintiff's home.  Boateng signed a handwritten document acknowledging his

9  physical receipt of plaintiff's vehicle and personal property.  The document also indicated that

10  Boateng was paid $4,000 by plaintiff for his services.  Boateng however paid more than $2,500

11  to MSC to have plaintiff's vehicle shipped.  (Def. State Farm's SUDF (Doc. No. 64) 2, 8-10.)[13]

12          On November 1, 2006, Boateng informed plaintiff via email that he had been in

13  Ghana for a month due to his father's illness, that there had been an issue with U.S. Customs

14  resulting in a delay in the shipping of plaintiff's vehicle to Africa and that the vehicle would

15  arrive in Africa in the first week of December.  Boateng also provided plaintiff with new contact

16  information.  (Def. State Farm's SUDF (Doc. No. 64) 11-14.)

17          On or about November 9, 2006, Boateng faxed to plaintiff a copy of a bill of

18  lading issued by Transglobal, Boateng's purported shipping company, and a copy of the title to

19  plaintiff's vehicle stamped by U.S. Customs.  The bill of lading indicated that plaintiff's vehicle

20  was being shipped in a container numbered MSCU1268680, on the MSC Marta Voyage 612R,

21  and that the vehicle was scheduled to arrive in Kampala, Uganda on December 10, 2006.  The

22  /////

23

24      [12]  As noted at the outset all three defendants have moved for summary judgment or
partial summary judgment in their favor.

25

26      [13]  Citations to defendants' Statement of Undisputed Facts are to the specific numbered
undisputed fact asserted.

17

1    bill of lading also listed plaintiff as the exporter, the consignee and the person to be notified once

2    the vehicle arrived in Kampala.  (Def. State Farm's SUDF (Doc. No. 64) 15-19.)

3              However, plaintiff's possessions arrived at the port of Dar Es Salaam, Tanzania

4    on January 1, 2007.  On May 2, 2007, plaintiff contacted Toni Forrester, a Claim Representative

5    for defendant State Farm and claimed that his vehicle had been stolen.  Forrester investigated the

6    matter and confirmed that defendant MSC's records indicated that the vessel carrying plaintiff's

7    vehicle left port on November 5, 2006, and arrived in port at Dar Es Salaam, Tanzania on

8    January 1, 2007.  On May 3, 2007, plaintiff filed a theft claim with defendant CSE.  On May 11,

9    2007, Boateng sent an email to the California Highway Patrol confirming that he had shipped

10   plaintiff's vehicle and that the vehicle was in the East African port awaiting proper clearance to

11   be delivered to Uganda.  On June 6, 2007, defendant State Farm requested that plaintiff contact

12   defendant MSC to request copies of all documents pertaining to the shipping of plaintiff's

13   vehicle because State Farm was unable to obtain these documents due to privacy laws.  (Def.

14   State Farm's SUDF (Doc. No. 64) 22-31; Def. CSE's SUDF (Doc. No. 113-1) 15.)

15             On June 18, 2007, State Farm Claim Representative Forrester spoke with plaintiff

16   and noted in her Activity Log that plaintiff "indicated he didn't want to spend a lot of time on

17   this claim so he was going to file a DOI complaint and then contact an attorney."  On June 19,

18   2007, defendant State Farm wrote plaintiff a letter informing him that it may have no duty to pay

19   plaintiff's loss claim because "[i]t is questionable whether the claim qualifies as a loss."

20   Defendant State Farm's letter also noted that the "Where Coverage Applies" provision of

21   plaintiff's insurance policy clearly stated that the policy applied only while plaintiff's vehicle was

22   in the United States and that coverage therefore would not apply to plaintiff's vehicle after it left

23   the United States en route to Africa.  (Def. State Farm's SUDF (Doc. No. 64) 32-34.)

24             On July 12, 2007, defendant CSE contacted plaintiff and advised him that he had

25   not submitted requested documentation in support of his loss claim.  On August 30, 2007,

26   defendant State Farm requested information from defendant MSC regarding plaintiff's vehicle

1   and MSC informed State Farm that the vehicle had arrived in port at Dar Es Salaam and was

2   awaiting pick up.  Defendant MSC advised defendant State Farm that plaintiff should contact Mr.

3   Shadrick Siwale regarding the release of his vehicle.  On August 31, 2007, Edmond Wade,

4   private counsel retained by State Farm, sent plaintiff a letter summarizing what State Farm had

5   learned from defendant MSC regarding plaintiff's vehicle.  Wade's letter to plaintiff concluded

6   by stating that "there is no evidence that there has been a loss of the Mercedes vehicle" and

7   advised plaintiff that under his State Farm policy, when his vehicle left Texas en route to Africa

8   it was no longer covered.  (Def. State Farm's SUDF (Doc. No. 64) 35-38, 42-43; Def. CSE's

9   SUDF (Doc. No. 113-1) 20.)

10          On October 31, 2007, Mr. Torlotting, an agent of defendant MSC, sent an email to

11  plaintiff confirming that the container holding plaintiff's possessions arrived unopened in Dar Es

12  Salaam and advising plaintiff to contact an MSC agent in Dar Es Salaam to determine what

13  plaintiff needed to do to retrieve them.  In an email he sent to defendant MSC, plaintiff requested

14  that MSC provide him with the storage and customs charges and stated that he would arrange for

15  someone to pick up his vehicle.  Defendant MSC responded, informing plaintiff that he needed

16  the original bill of lading to retrieve his vehicle after paying all relevant charges.  Plaintiff, in

17  turn, replied by indicating that he would refuse to pay storage costs and wished to negotiate the

18  release of his vehicle.  In response, the representative of defendant MSC explained that because

19  plaintiff did not possess the original bill of lading, he should seek a court order for the release of

20  his cargo.[14]  (Def. State Farm's SUDF (Doc. No. 64) 44-45, 47-49, 51.)

21          The container of plaintiff's possessions, however, was never retrieved.  The full

22  container was "Gate Out" in Dar Es Salaam on February 9, 2008 and returned to the shipping

23

24          [14]  Defendant State Farm's Statement of Undisputed Facts provides a lengthy and detailed
        account of the numerous communications between plaintiff and defendant MSC concerning the
        documentation needed for plaintiff to obtain the release of his vehicle and personal property.
25  (See Def. State Farm's SUDF (Doc. No. 64) 58-64.)  Those communications are not recounted
        here because they are not necessary for or relevant to the resolution of the motions for summary
26  judgment brought on behalf of defendant State Farm or defendant CSE.

1   yard empty on February 11, 2008.  Plaintiff's vehicle was handed over to the Ubungo Customs

2   Warehouse for storage before it was eventually advertised for public auction.  Plaintiff's vehicle

3   was first offered for sale at public auction on March 3, 2008, but was not sold until August 11,

4   2008.  (Def. State Farm's SUDF (Doc. No. 64) 3-7.)

5   III.  Defendant's Arguments

6       A.  State Farm

7               Counsel for defendant State Farm argues that State Farm is entitled to summary

8   judgment in its favor with respect to plaintiff's claims for breach of contract, breach of the

9   implied covenant of good faith and fair dealing and the intentional infliction of emotional

10  distress.  Defense counsel also argues that plaintiff's punitive damages claim fails.  (Def. State

11  Farm's Mem. of P. & A. (Doc. No. 63) at 17-29.)

12              First, counsel argues that the undisputed evidence before the court establishes that

13  plaintiff was not entitled to coverage benefits under the terms of his automobile insurance policy.

14  Specifically, counsel contends that once plaintiff's vehicle left the port in Texas en route to

15  Africa, plaintiff's State Farm automobile insurance policy no longer applied.  According to

16  defendant State Farm, under the terms of the policy plaintiff was not due any benefits for his

17  vehicle which was lost or abandoned, and later auctioned, in Africa.  (Def. State Farm's Mem. of

18  P. & A. (Doc. No. 63) at 17-18.)

19              Second, counsel for defendant State Farm argues that plaintiff's claim for breach

20  of the implied covenant of good faith and fair dealing fails for several reasons.  Specifically,

21  counsel contends that: 1) plaintiff's claim fails because as a matter of law there was no coverage

22  for his vehicle in Africa; 2) State Farm's determination that coverage did not apply was

23  reasonable; 3) State Farm reasonably relied on the coverage determination of private counsel; and

24  4) insurers are not liable for the breach of the covenant of good faith and fair dealing when there

25  is a genuine dispute as to coverage.  (Def. State Farm's Mem. of P. & A. (Doc. No. 63) at 19-23.)

26  /////

1           Third, defendant State Farm argues that plaintiff's claim for the intentional

2  infliction of emotional distress fails because plaintiff cannot establish the essential elements of

3  such a claim.  Specifically, defense counsel argues that the evidence submitted in connection

4  with the pending motion for summary judgement establishes that defendant State Farm did not

5  engage in outrageous conduct and that plaintiff did not suffer severe distress.  (Def. State Farm's

6  Mem. of P. & A. (Doc. No. 63) at 24-25.)

7           Finally, defense counsel argues that plaintiff's claim for a punitive damages award

8  fails as a matter of law because there is no evidence that defendant State Farm engaged in

9  conduct constituting fraud, oppression or malice.  In this regard, counsel argues that the evidence

10  submitted in connection with the pending motion establishes that defendant State Farm's actions

11  were reasonable and that plaintiff therefore cannot prove the elements required to support a

12  punitive damages award.  (Def. State Farm's Mem. of P. & A. (Doc. No. 63) at 26-28.)

13      B.  Defendant CSE

14           Counsel for defendant CSE argues that CSE is entitled to summary judgment in

15  its favor with respect to all of plaintiff's claims.  Specifically, defense counsel argues that: 1) the

16  undisputed evidence establishes that defendant CSE did not owe plaintiff any benefits under the

17  terms of his insurance policy; 2) that plaintiff's property was not stolen but was abandoned by

18  plaintiff; 3) that plaintiff has failed to show that defendant CSE's conduct was extreme or

19  outrageous; 4) that defendant CSE cannot be held liable for professional negligence; and 5) that

20  plaintiff has failed to present any evidence that defendant CSE engaged in malicious, fraudulent

21  or oppressive conduct as necessary to support a claim for punitive damages.  (Def. CSE's Mem.

22  Of P. & A. (Doc. No. 113) at 17-23.)

23  IV.  Plaintiff's Opposition

24      A.  As To Defendant State Farm's Motion For Summary Judgment

25           Plaintiff's opposition does not comply with Local Rule 260(b), which requires a

26  party opposing summary judgment to (1) reproduce each fact enumerated in the moving party's //

statement of undisputed facts and (2) expressly admit or deny each fact.[15]  Under that provision

the party opposing summary judgment is also required to cite evidence in support of each denial.

In the absence of the required admissions and denials, the court has reviewed plaintiff's

arguments and evidence in an effort to discern whether plaintiff denies any fact asserted in

defendant's statements of undisputed facts and, if so, what evidence plaintiff has offered that may

demonstrate the existence of a disputed issue of material fact with respect to any of his claims.

       In opposing defendant State Farm's motion for summary judgment plaintiff argues

that: 1) his vehicle was insured by defendant State Farm; 2) State Farm's handling of his loss

claim was unreasonable; 3) State Farm's assertion that plaintiff abandoned his vehicle in Africa

is false; 4) State Farm failed to investigate his claim; 5) State Farm failed to seek legal action

against defendant MSC; 6) State Farm's conduct was fraudulent, oppressive and malicious; 7)

State Farm's conduct was outrageous; and 8) State Farm's unreasonable delay and poor handling

of his loss claim supports an award of punitive damages.  (Pl.'s Opp.'n. to State Farm (Doc. No.

93) at 2-32.)

     B. <u>As To Defendant CSE's Motion For Summary Judgment</u>

       In opposing defendant CSE's motion for summary judgment, plaintiff merely

reasserts the arguments in support of his claims for relief as found in his compliant.[16]  (Pl.'s

Opp.'n. to CSE (Doc. No. 115) at 4-5, 20-34.)

---

[15]  Defendant State Farm's amended motion for summary judgment was filed and served on September 15, 2010.  (Doc. Nos. 84 and 86.)  Plaintiff, however, failed to file a timely opposition to that motion.  At the October 25, 2010 hearing on the motion, despite plaintiff's questionable excuse for his failure to file a written opposition, the court granted plaintiff until November 29, 2010 to file his opposition.  Plaintiff was explicitly instructed at that hearing to review the requirements of Local Rule 260(b) in drafting his opposition.  Moreover, the undersigned issued a written order cautioning plaintiff that "the requirements of Local Rule 260(b) will be enforced."  (Doc. No. 91.)  Nonetheless, plaintiff disregarded the court's written and verbal instructions by filing an opposition that failed to comply with Local Rule 260(b). (Doc. No. 93.)

[16]  Plaintiff's opposition to defendant CSE's motion for summary judgment also fails to comply with Local Rule 260(b).  (Doc. No. 116.)

1   V.  Defendants' Reply

2       A.  Defendant State Farm

3           In reply, counsel for defendant State Farm argues that: 1) plaintiff does not dispute

4   any of the undisputed facts asserted by defendant State Farm as required by Local Rule 260(b);

5   2) plaintiff fails to address or adequately oppose the material points raised in State Farm's motion

6   for summary judgment; 3) plaintiff does not object to any of the evidence offered by State Farm

7   in support of its motion; 4) plaintiff has failed to comply with Local Rule 260(b); and 5) plaintiff

8   has failed to offer any admissible evidence in opposition to State Farm's motion for summary

9   judgment.[17]  (Def. State Farm's Reply (Doc. No. 95) at 6-21.)

10      B.  Defendant CSE

11          In reply, counsel for defendant CSE merely reiterates the arguments found in

12  CSE's motion for summary judgment.  (Def. CSE's Reply (Doc. No. 114) at 7-17.)

13                                          ANALYSIS

14  I.  Application of the Standard

15      A.  Breach of Contract

16          Defendants State Farm and CSE seek summary judgment in their favor with

17  respect to plaintiff's first cause of action for breach of contract on the ground that the undisputed

18  evidence before the court establishes that plaintiff was not entitled to coverage benefits under the

19  terms of either the insurance policy issued by State Farm or that issued by CSE.  Specifically,

20  counsel for both defendants argues that the evidence submitted in connection with the pending

21  summary judgment motions establishes that plaintiff's vehicle was not stolen in the United States

22  but was instead shipped to Africa, at plaintiff's request, and abandoned there by plaintiff.  (Def.

23  /////

24

25          [17]  As noted above, in response to defendant's reply plaintiff filed an unauthorized

26  "response," in which plaintiff merely further disputes some of the arguments State Farm offered
    in reply.  (Doc. No. 101.)

1    State Farm's Mem. Of P. & A. (Doc. No. 63) at 17-19; Def. CSE's Mem. Of P. & A. (Doc. No.

2    113) at 17-18.))

3              To establish a breach of contract claim under California law, plaintiff must prove

4    the following: "(1) existence of the contract; (2) plaintiff's performance or excuse for

5    nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach."

6    CDF Firefighters v. Maldonado, 158 Cal. App.4th 1226, 1239 (2008).  Here, there is no dispute

7    that plaintiff had an automobile insurance contract with defendant State Farm and a homeowners

8    insurance contract with defendant CSE.  Under those contracts, State Farm agreed to insure

9    plaintiff's vehicle against a covered loss and CSE agreed to insure plaintiff's personal property

10   against a covered loss.  Under each policy, loss as a result of theft was a covered loss.[18]

11   (Forrester Decl. (Doc. No. 68) at 61-65; Taylor Decl. (Doc. No. 113-4) at 15-16.)

12             Moreover, for purposes of these motions, there is no challenge to plaintiff's

13   performance as it relates to those insurance contracts or dispute over the damages plaintiff has

14   suffered.  In this regard, the sole issue here is whether defendants' denial of plaintiff's loss claims

15   constituted a breach of the insurance contracts.  Defendants contend that plaintiff was owed no

16   coverage benefits under the insurance contracts because his possessions were not stolen but were

17   abandoned by plaintiff himself in Africa.

18             The undisputed evidence before the court establishes the following.  On

19   September 3, 2006, plaintiff picked up Mr. Boateng from the Sacramento International Airport

20   and the two traveled to plaintiff's home.  Boateng signed a handwritten document acknowledging

21   his physical receipt of plaintiff's vehicle and personal property.  The written receipt also

22   indicated that plaintiff paid Boateng $4,000 for his services.  On October 25, 2006, Boateng

23   reserved a twenty-foot container from defendant MSC, under the business name Intercontinental

24   _____

25       [18]  While defendant State Farm's insurance policy only provided coverage against loss of
     plaintiff's vehicle while it was in the United States, defendant CSE's insurance policy provided
     coverage against loss of plaintiff's personal property "while [it was] anywhere in the word."

26   (Taylor Decl. (Doc. No. 113-4) at 12.)

1    Shipping, to be shipped aboard the MSC Marta Voyage with discharge in Dar Es Salaam,

2    Tanzania.  Boateng paid MSC more than $2,500 for the container and shipping to Dar Es

3    Salaam.  (Sutherland Decl. (Doc. No. 66) at 12; Forrester Decl. (Doc. No. 68) at 26.)

4            On November 1, 2006, Boateng emailed plaintiff, informing him that Boateng had

5    been in Ghana "since [the] end of September" due to his father's illness, that there had been an

6    issue with U.S. Customs that delayed shipping plaintiff's vehicle to Africa, but that Boateng had

7    "shipped the car" and that it would "arrive" in the first week of December.  Boateng asked

8    plaintiff to tell plaintiff's wife "not to worry, as I am not a bad person at all."  Boateng also

9    provided plaintiff with new contact information.  Sometime thereafter, Boateng sent plaintiff's

10   wife a written "letter of apology" in which Boateng stated with respect to plaintiff's possessions

11   that "[o]nce it sails it tranships through the Port of Salalah in Saudi Arabia, then to Mombasa,

12   before we go through the process of clearing in Mombasa, before final arrival in Kampala."

13   (Sutherland Decl. (Doc. No. 66) at 30; Forrester Decl. (Doc. No. 68) at 28.)

14           On or about November 9, 2006, Boateng faxed plaintiff's local State Farm

15   Insurance Agent a copy of a bill of lading issued by Transglobal to plaintiff, and a copy of the

16   title to plaintiff's vehicle stamped by U.S. Customs.  Boateng did not provide plaintiff with a

17   copy of the bill of lading issued by defendant MSC to Intercontinental Shipping.  The bill of

18   lading issued by Transglobal to plaintiff did, however, provide the true container number

19   containing plaintiff's possessions and the name of the ship carrying them.  The Transglobal bill

20   of lading also stated that plaintiff's possessions were scheduled to arrive in Kampala, Uganda on

21   December 10, 2006, and listed plaintiff as the exporter, the consignee and the person to be

22   notified once the vehicle arrived at that destination.  Neither Dar Es Salaam, Tanzania, or

23   Mombasa, Kenya were noted on the Transglobal bill of lading issued by Boateng to plaintiff.

24   (Sutherland Decl. (Doc. No. 66) at 26-28.)

25           On January 1, 2007, plaintiff's possessions arrived at the port of Dar Es Salaam.

26   In May of 2007 plaintiff notified defendants of his loss as a result of the claimed theft.  On May

11, 2007, Boateng sent an e-mail to the California Highway Patrol claiming that there was a mistake at the port of transhipment and that the container had to be transferred to a different port, but was nonetheless in the process of being delivered within the "next few weeks."  Boateng sent a second, similar email on May 14, 2007.  On August 31, 2007, defendant State Farm notified plaintiff, through retained counsel Edmond Wade, that defendant MSC had confirmed that they were in possession of plaintiff's goods in a container in Dar Es Salaam, and that plaintiff should contact the MSC office in Dar Es Salaam in order to obtain them.  (Forrester Decl. (Doc. No. 68) at 34, 36; Wade Decl. (Doc. No. 67) at 3.)

In this regard, defendants characterize this evidence as establishing that plaintiff's possessions were not stolen but instead that: 1) plaintiff arranged to have Boateng ship them to Kampala; 2) Boateng initiated the shipping process; 3) plaintiff's possessions arrived in Dar Es Salaam while en route to Kampala; 4) Boateng failed to complete the delivery of plaintiff's possessions; 5) defendants notified plaintiff that his possessions were in Dar Es Salaam; and 6) plaintiff simply failed to obtain them from the port in Dar Es Salaam despite being provided the opportunity to do so.

Plaintiff disputes defendants' characterization of the evidence and argues that: 1) Boateng became difficult to reach soon after taking control of plaintiff's possessions; 2) plaintiff reported that his possessions were stolen by Boateng before they left the United States; 3) the Elk Grove Police Department notified plaintiff and defendant State Farm in October of 2006 that plaintiff's vehicle might be at the MSC office in Houston, Texas; 4) Boateng delayed shipping plaintiff's possessions for unknown reasons; 5) Boateng used a different company name in obtaining the bill of lading from defendant MSC than he used in the bill of lading he issued to plaintiff; 6) Boateng never gave plaintiff a copy of the bill of lading defendant MSC issued to Boateng; 7) Boateng told plaintiff that his possessions were going to be shipped through Mombasa, not Dar Es Salaam; and 8) Boateng never delivered plaintiff's possessions to Kampala as contracted for.

1    In support of his argument plaintiff states in his declaration, signed under penalty

2  of perjury, that two days after Boateng left Sacramento, and well before plaintiff's vehicle and

3  personal property left the United States en route to Africa, plaintiff reported that his possessions

4  had been stolen by Boateng to his local State Farm Agent, Jay Prakash and to the Elk Grove

5  Police Department.  Plaintiff declares that Prakash advised him to "wait awhile before filing a

6  claim" to see if Boateng would ultimately deliver plaintiff's possessions to Kampala, and that the

7  Elk Grove Police Department advised plaintiff to first send Boateng a demand letter.  (Diamond

8  Decl. (Doc. No. 101-1) at 2.)

9    Plaintiff also declares that he communicated with officers from the Elk Grove

10  Police Department and the Grand Prairie Police Department in Texas, concerning their

11  investigations into the location of Boateng and plaintiff's possessions.  Plaintiff specifically

12  refers to "Det. Franco, Det. Cito and the other detectives that I spoke with . . . ." (Id. at 3.)

13    In opposing summary judgment plaintiff has also provided a copy of the March 6,

14  2007, demand letter he sent to Boateng as well as a March 23, 2007 "Vehicle Report" from an A.

15  Franco of the Elk Grove Police Department.  (Pl.'s Response to Sutherland Decl. (Doc. No. 38)

16  at 15; Pl.'s Supplemental Responses (Doc. No. 46) at 22, 37.)  In that Vehicle Report the box

17  next to the identifier "Embezzled Vehicle" is checked.  (Pl.'s Supplemental Responses (Doc. No.

18  46) at 37.)  The narrative of that report states:

19    Notice: MSC may be in possession of this stolen vehicle and
20    contents in a container owned by MSC located at Port of Dar Es
    Salaam, Tanzania-Africa.

21    Please hand over vehicle and contents to INTERPOL or registered
    owner – Mr. Arthur Diamond.
22

23    Contact Officer A. Franco ... to provide additional information.

24  (Id.)  Plaintiff has also submitted an April 29, 2008 fax from the Elk Grove Police Department to

25  defendant MSC regarding a "STOLEN/EMBEZZLED VEHICLE REPORT."  (Id. at 38.)

26  /////

1          Moreover, filed with plaintiff's opposition to defendant State Farm's motion for

2     summary judgment are copies of State Farm's Activity Logs.[19]  According to those logs, State

3     Farm Claim Representative Toni Forrester was advised on June 1, 2007, by a Detective Johnny

4     Hicks from Texas, that Hicks was investigating another case involving Boateng in which the

5     "victim" had arranged for Boateng to ship a vehicle to Africa but the vehicle "either never

6     shipped or it didn't arrive."  (Pl.'s Opp.'n. to State Farm (Doc. No. 93) at 47.)  Hicks indicated to

7     Forrester that, having learned of plaintiff's case, he was going to return to "the judge again to see

8     if they will consider this a criminal case and get a warrant for Charles Boateng."  (Id.)  Plaintiff

9     also points to a copy of an email between his local State Farm agent Jay Prakash and another

10    State Farm agent in which Prakash asked on May 2, 2008, "please advise how far back we could

11    backdate and cancel [plaintiff's] policy as the vehicle had been stolen since 9/3/06."  (Id. at 38.)

12    On June 3, 2008, plaintiff's policy was canceled and he was issued a refund of the unearned

13    portion of his State Farm auto insurance premium payment.  (Id. at 39.)

14         Plaintiff argues that he was concerned that Boateng had stolen his possessions

15    soon after Boateng departed Sacramento, that plaintiff reported the theft to his State Farm agent

16    and the Elk Grove Police Department while his possessions were still in the United States, and

17    that he was advised to wait longer.  While waiting, plaintiff's fears worsened as a result of

18    Boateng's suspicious behavior.  Plaintiff eventually learned that Boateng routed plaintiff's

19    possessions to a previously undiscussed location, Dar Es Salaam, and abandoned them there for

20    unknown reasons.

21    /////

22

---

23         [19]  Defendant State Farm has asserted numerous evidentiary objections to the documents
      submitted by plaintiff in support of his opposition to the pending summary judgment motion.
24    (Doc. No. 97.)  Those objections are overruled for purposes of these motions.  See Fraser v.
      Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage we do not focus
25    on the admissibility of the evidence's form.  We instead focus on the admissibility of its
      contents."); FDIC v. N.H. Ins. Co., 953 F.2d 478, 485 (9th Cir. 1991) (same); see also Burch v.
26    Regents of the University of California, 433 F. Supp.2d 1110, 1118-1122 (E.D. Cal. 2006).

1    Defendants reject plaintiff's characterization of the evidence before the court and

2    argue that Boateng simply abandoned plaintiff's possessions en route to Kampala, that plaintiff

3    could have retrieved them from defendant MSC in Dar Es Salaam, but that plaintiff refused to do

4    so.  In this regard, defendants contend that the evidence establishes that plaintiff's possessions

5    were not lost and that plaintiff's loss claims were therefore properly denied.

6    Whether defendants properly denied plaintiff's loss claims hinges entirely upon

7    whether plaintiff's possessions were abandoned by plaintiff because he failed to obtain them

8    from Dar Es Salaam after Boateng failed to complete the delivery process, as defendants assert,

9    or wether they were stolen by Boateng, as plaintiff asserts.  If Boateng did not steal plaintiff's

10   possessions, then defendants did not breach the terms of their respective insurance contracts by

11   denying plaintiff's loss claims.  However, if plaintiff's possessions were stolen by Boateng

12   defendants would appear to have breached the terms of the respective insurance contracts by

13   denying plaintiff's loss claims because theft was a covered loss under each insurance contract.

14   For purposes of summary judgment, "[t]he court must not weigh the evidence or

15   determine the truth of the matter but only determine whether there is a genuine issue for trial."

16   Crane v. Conoco, Inc., 41 F.3d 547, 54950 (9th Cir. 1994).  Moreover, as noted above, all

17   reasonable inferences that may be drawn from the facts placed before the court must be drawn in

18   favor of the party opposing summary judgment.  See Matsushita, 475 U.S. at 587.  Given the

19   evidence before the court on summary judgment, drawing all inferences therefrom in favor of

20   plaintiff as the party opposing summary judgment, the court finds that a reasonable jury could

21   find that plaintiff's possessions were stolen by Boateng and therefore that defendants' denial of

22   plaintiff's loss claims constituted a breach of his insurance contracts.  Accordingly, the motions

23   for summary judgment brought on behalf of defendants' State Farm and CSE should be denied.

24   B.  Professional Negligence

25   Defendant CSE also seek summary judgment in its favor on plaintiff's second

26   cause of action for professional negligence.  Specifically, counsel for defendant CSE argues that

1    professional negligence is not a recognized tort under California law.  (Def. CSE's Mem. Of P. &

2    A. (Doc. No. 113) at 22.)

3              On May 7, 2009, defendant State Farm moved for dismissal of this claim as to

4    State Farm raising the same argument defendant CSE now raises.  (Doc. No. 14.)  The

5    undersigned issued findings and recommendations on July 26, 2010, recommending that State

6    Farm's motion be granted.[20]  (Doc. No. 75.)  In the July 26, 2010 findings and recommendations

7    the undersigned noted that this issue had been addressed by other district courts in California,

8    specifically in Unical Enterprises, Inc. v. The American Insurance Co., et al., No. CV 05-3511

9    CPM (PJWx), 2005 WL 6133910 (C.D. Cal. Sept. 12, 2005).  In Unical, the district court

10   concluded as follows:

11            Under California law "negligence is not among the theories of
             recovery generally available against insurers"  Sanchez v. Lindsey
12            Morden Claims Services, Inc., 72 Cal. App.4th 249, 254 (1999)
             (emphasis in original); Tento Int'l, Inc., v. State Farm Fire & Cas.
13            Co., 222 F.3d 660, 664 (9th Cir. 2000) (noting unlikely viability of
             claim for negligent handling of insurance claim because
14            Californian courts do not generally recognize a claim of negligence
             against insurers).  Since the relationship between the insured and
15            the insurer under such circumstances closely approximates that of
             principal and agent or beneficiary and trustee, most courts have
16            based liability upon bad faith rather than upon negligence.  Brown
             v. Guarantee Insurance Co., 155 Cal. App.2d 679, 687 (1957).

17                                     * * *

18            Plaintiff has not provided any legal support for why it should be
             allowed to pursue a negligence claim in this case despite the
19            general rule that negligence actions are not permitted against
             insurers.  Despite the open-ended language of California courts that
20            negligence actions generally do not lie against insurers, there is no
             case law that provides a guide for when such exceptions are
21            appropriate.  Accordingly, the Court GRANTS American's motion
             to dismiss Plaintiff's first cause of action for negligence WITH
22            PREJUDICE.

23   2005 WL 6133910, at *2.

24   /////

25   _____

26           [20]  Those findings and recommendations were adopted by the assigned district judge on
     August 26, 2010.  (Doc. No. 78.)

1        Similarly, another California district court has observed in granting a defendant

2  insurer's motion for summary judgement on an insured's negligence claim that:

> 3  Plaintiffs do not cite a single example where a court has found an
> insurer's failure to properly investigate capable of supporting a
> 4  separate negligence cause of action under California law.  Instead,
> Plaintiffs urge the Court to rely on fundamental tort principles to
> 5  recognize its negligence claim.  The Court finds doing so would be
> an expansion unwarranted by California case law and declines to
> 6  do so.

7  Everett Associates, Inc. v. Transcontinental Insurance Co., 159 F. Supp.2d 1196, 1204 (N.D. Cal.

8  2001).

9        The undersigned once again finds the analysis of these district court cases

10  applicable and persuasive.  Under California law the general rule is that an insured may not

11  proceed on a separate negligence claim against an insurer.  Plaintiff has cited no example of a

12  court ruling to the contrary, nor has he presented argument that would make an exception to that

13  general rule appropriate here in light of his other claims against defendant CSE.  Accordingly,

14  defendant CSE's motion for summary judgment in its favor as to plaintiff's professional

15  negligence claim should be granted.

16      C.  Implied Covenant of Good Faith And Fair Dealing

17        Defendants State Farm and CSE both seek summary judgment in their favor with

18  respect to plaintiff's third cause of action for breach of the implied covenant of good faith and

19  fair dealing.  Specifically, counsel for both defendants argue that plaintiff was not due any

20  coverage benefits under the terms of his insurance policies and that even if this were not the case

21  there was a "genuine dispute" regarding plaintiff's loss claims.  (Def. State Farm's Mem. Of P. &

22  A. (Doc. No. 63) at 19-24; Def. CSE's Mem. Of P. & A. (Doc. No. 113) at 18-20.))

23        "To establish a breach of an implied covenant of good faith and fair dealing, a

24  plaintiff must establish the existence of a contractual obligation, along with conduct that

25  frustrates the other party's rights to benefit from the contract."  Fortaleza v. PNC Fin. Servs.

26  Group, Inc., 642 F. Supp.2d 1012, 1021-22 (N.D. Cal. 2009) (citing Racine & Laramie v. Dep't

1  of Parks & Rec., 11 Cal. App.4th 1026, 1031 (1992)).  The "implied covenant of good faith and

2  fair dealing is limited to assuring compliance with the express terms of the contract, and cannot

3  be extended to create obligations not contemplated by the contract."  Pasadena Live, LLC v. City

4  of Pasadena, 114 Cal. App.4th 1089, 1093-1094 (2004).  See also Guz v. Bechtel Nat. Inc., 24

5  Cal.4th 317, 349-50 (Cal. 2000) ("[T]he implied covenant will only be recognized to further the

6  contract's purpose; it will not be read into a contract to prohibit a party from doing that which is

7  expressly permitted by the agreement itself.").

8          Moreover, "[t]he implied covenant of good faith and fair dealing does not impute

9  an obligation on the insurer to pay every claim made by its insured."  Wilson v. 21st Century Ins.

10 Co., 42 Cal.4th 713, 721 (2007).  Nonetheless, when "the insurer unreasonably and in bad faith

11 withholds payment of the claim of its insured, it is subject to liability in tort."  Id. at 720 (quoting

12 Frommoethelydo v. Fire Ins. Exch, 42 Cal.3d 208, 214-215 (Cal. 1986)).  To avoid such liability,

13 an insurer must fully investigate a claim's grounds for denial and approval.  Wilson, 42 Cal.4th at

14 721.  Likewise, an insurer must not deny a claim on grounds unfounded or contradicted by

15 known facts.  Id.

16         There must be proof the insurer failed or refused to discharge its
           contractual duties not because of an honest mistake, bad judgment,
17         or negligence, "but rather by a conscious and deliberate act, which
           unfairly frustrates the agreed common purposes and disappoints the
18         reasonable expectations of the other party thereby depriving that
           party of the benefits of the agreement."
19

20 Century Sur. Co. v. Polisso, 139 Cal. App.4th 922, 949 (2006) (quoting Chateau Chamberay

21 Homeowners Assn. v. Associated Internat. Ins. Co., 90 Cal. App.4th 335, 345 (2001)).  "[T]he

22 critical issue [is] the reasonableness of the insurer's conduct under the facts of the particular case.

23 . . .  An insurer's good or bad faith must be evaluated in light of the totality of the circumstances

24 surrounding its actions."  Wilson, 42 Cal.4th at 723.

25 /////

26 /////

1  Under the "genuine dispute" rule:

2  [A]n insurer denying or delaying the payment of policy benefits
due to the existence of a genuine dispute with its insured as to the
3  existence of coverage liability or the amount of the insured's
coverage claim is not liable in bad faith even though it might be
4  liable for breach of contract.

5  Id. (quoting Chateau Chamberay Homeowners Assn., 90 Cal. App.4th at 34).

6  The genuine issue rule in the context of bad faith claims allows a
[trial] court to grant summary judgment when it is undisputed or
7  indisputable that the basis for the insurer's denial of benefits was
reasonable - for example, where even under the plaintiff's version
8  of the facts there is a genuine issue as to the insurer's liability
under California law. [Citation.] . . . On the other hand, an insurer
9  is not entitled to judgment as a matter of law where, viewing the
facts in the light most favorable to the plaintiff, a jury could
10  conclude that the insurer acted unreasonably.

11  Wilson, 42 Cal.4th at 724 (quoting Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1161-

12  1162 (9th Cir. 2002)).

13  Here, defendant State Farm fully investigated plaintiff's loss claim and, given the

14  challenging facts of this case, its denial of plaintiff's loss claim was reasonable. The undisputed

15  evidence before the court on summary judgment establishes that in September of 2006 plaintiff

16  surrendered his vehicle to Boateng for shipment to Kampala, Uganda-Africa. On January 1,

17  2007, plaintiff's vehicle arrived in Dar Es Salaam, Tanzania-Africa. On May 2, 2007, plaintiff

18  reported to State Farm that his vehicle had been stolen. State Farm Claim Representative Toni

19  Forrester began investigating plaintiff's loss claim the following day.

20  Forrester obtained emails from Boateng to the California Highway Patrol from

21  May 11, 2007, and May 14, 2007, in which Boateng disputed that plaintiff's vehicle had been

22  stolen, confirmed that he had shipped plaintiff's vehicle at plaintiff's request, and stated that the

23  vehicle was in the East African Port awaiting clearance before being transported to Kampala,

24  Uganda. On June 6, 2007, Forrester sent plaintiff a letter requesting that plaintiff contact MSC to

25  obtain documents pertaining to the shipping of his container. On June 18, 2007, Forrester spoke

26  to plaintiff who indicated that "he didn't want to spend a lot of time on this claim so he was

33

1    going to file a DOI complaint and then contact an attorney."  (Def. State Farm's SUDF (Doc. No.

2    64) 32.)  On June 19, 2007, Forrester wrote plaintiff a letter notifying him that State Farm may

3    not have a duty to pay because it was questionable as to whether his claim qualified as a loss.  On

4    August 30, 2007, Forrester sent an email to defendant MSC requesting information regarding

5    plaintiff's vehicle.  MSC advised Forrester that plaintiff's vehicle arrived in Dar Es Salaam on

6    January 1, 2007, and was awaiting pick up.  MSC further advised that plaintiff should contact its

7    office in Dar Es Salaam to obtain more information regarding the release of his vehicle.

8            In short, in May of 2007 plaintiff filed a loss claim with State Farm, alleging that

9    his vehicle had been stolen.  State Farm immediately initiated an investigation which located the

10   vehicle in Dar Es Salaam.  During the course of its investigation, defendant State Farm received

11   information indicating that plaintiff had arranged for his vehicle to be shipped to Africa, that it

12   was shipped to Africa, and that the vehicle was available there to be claimed by plaintiff.  In this

13   regard, it was reasonable for defendant State Farm to deny plaintiff's loss claim on the ground

14   that his vehicle had not been stolen, even if that determination could ultimately be found to be

15   incorrect.  See Brandt v. Superior Court, 37 Cal.3d 813, 819 (1985) ("An erroneous

16   interpretation of an insurance contract by an insurer does not necessarily make the insurer liable

17   in tort for violating the covenant of good faith and fair dealing; to be liable in tort, the insurer's

18   conduct must also have been *unreasonable*.") (emphasis in original) (quotation omitted);

19   Tomaselli v. Transamerica Ins. Co., 25 Cal. App.4th 1269, 1280-81 (1994) ("The mistaken

20   withholding of policy benefits, if reasonable or based on a legitimate dispute as to the insurer's

21   liability . . . does not expose the insurer to bad faith liability.")

22           Moreover, on August 30, 2007, Forrester consulted with a private attorney,

23   Edmond Wade, regarding plaintiff's loss claim.  Wade reviewed the facts surrounding plaintiff's

24   claim and advised defendant State Farm that, in his opinion, plaintiff was not due any benefits

25   under his automobile insurance policy.  "The use of counsel tends to support [that] State Farm

26   acted in good faith."  Herbert v. State Farm Mut. Auto. Ins. Co., No. C 06-05532 SBA, 2008 WL

1    425941, *8 (N.D. Cal. 2008) (citing State Farm Mut. Auto. Ins. Co. v. Superior Ct., 228 Cal.

2    App.3d 721, 725 (1991)).

3          Turning to defendant CSE's motion, counsel argues that "CSE has ample

4    evidence to support the genuine dispute doctrine" and that "CSE promptly and thoroughly

5    investigated the claim."[21]  (Def. CSE's Mem. Of P. & A. (Doc. No. 113) at 20.)  However, it is

6    well-established that "[a]n insurer may breach the covenant of good faith and fair dealing when it

7    fails to properly investigate its insured's claim."  Egan v. Mutual of Omaha Ins. Co., 24 Cal.3d

8    809, 817 (1979).  In this regard, "[a]mong the most critical factors bearing on the insurer's good

9    faith is the adequacy of its investigation of the claim."  Shade Foods, Inc. v. Innovative Products

10   Sales & Marketing, Inc., 78 Cal. App.4th 847, 879 (2000).  Moreover, "[a]n unreasonable failure

11   to investigate amounting to such unfair dealing may be found when an insurer fails to consider,

12   or seek to discover, evidence relevant to the issues of liability and damages."  Id. at 880.  "When

13   investigating a claim, an insurance company has a duty to diligently search for evidence which

14   supports its insured's claim.  If it seeks to discover only the evidence that defeats the claim it

15   holds its own interest above that of its insured."  Mariscal v. Old Republic Life Ins. Co., 42 Cal.

16   App.4th 1617, 1620 (1996).  "[W]here an insurance company fails to properly investigate and

17   later coverage under a first party policy is established, the lack of proper investigation will

18   certainly be relevant in establishing the company's bad faith."  McMillin Scripps North

19   Partnership v. Royal Ins. Co., 19 Cal. App.4th 1215, 1222 (1993).

20         Here, defendant CSE has offered a declaration, signed under penalty of perjury,

21   from Kelly Taylor, CSE's Property Director at the time plaintiff submitted his loss claim.  Taylor

22

23         [21]  Defendant CSE primarily argues that plaintiff's bad faith claim fails as a matter of law
     because his personal property was abandoned, not stolen, and therefore he was not entitled to
24   benefits under their policy.  (Def. CSE's Mem. Of P. & A. (Doc. No. 113) at 18-20.)  While it is
     true that there can be no action for breach of the implied covenant of good faith and fair dealing
25   if there were no policy benefits due, see Waller v. Truck Ins. Exchange, Inc., 11 Cal.4th 1, 36
     (1995), the undersigned has already determined that there is a genuine issue of material fact as to
26   whether plaintiff was due benefits under the CSE policy.

1    declares that plaintiff made his loss claim to defendant CSE on May 3, 2007, and that CSE

2    started its investigation the same day.  (Taylor Decl. (Doc. No. 113-4) at 3.)  Attached to Taylor's

3    declaration as exhibits are two letters from Taylor to plaintiff.  The first letter is dated July 12,

4    2007, and states in relevant part, that: 1) CSE received plaintiff's Internet Request for Assistance

5    through the California Department of Insurance; 2) CSE referred plaintiff's loss claim to the

6    independent adjusting firm Sams and Associates Insurance Services; 3) Sams and Associates

7    took plaintiff's recorded statement; 4) CSE ordered copies of plaintiff's police report; 5) CSE

8    requested that plaintiff provide additional documentation in support of his claim; 6) based on the

9    information received by Sams and Associates, CSE initiated additional investigation into

10   plaintiff's claim; and 7) CSE needed more time to evaluate plaintiff's claim.  (Id. at 31-33.)  The

11   second letter from Taylor to plaintiff is dated August 14, 2007, and states in relevant part that

12   CSE received plaintiff's July 20, 2007 letter to CSE, that CSE was still investigating plaintiff's

13   claim and that it would keep him updated on the progress of that investigation.  (Id. at 34.)

14           Plaintiff however has submitted to the court a June 5, 2007 letter from Sams and

15   Associates that states in relevant part that Sams and Associates "submitted a report to CSE for

16   their review and consideration," that the "estimated Repair/Replacement Cost" of plaintiff's

17   property was $10,652.97, and that plaintiff's net claim after depreciation and deductible was

18   $6,792.41.  (Pl's Opp.'n. to CSE (Doc. Nos. 115 at 44.)  Plaintiff has also submitted a copy of a

19   June 25, 2007, letter he received from defendant CSE in which CSE requested: 1) a copy of

20   plaintiff's contract with Global Shipping Co.; 2) the address for Global Shipping Co.; and 3) the

21   date plaintiff amended his police reports.  (Id. at 46.)  Plaintiff replied to defendant CSE with the

22   requested information on June 29, 2007.  (Id. at 47-48.)  Thus, in opposing summary judgment

23   plaintiff has presented evidence that Sams and Associates completed its investigation into

24   plaintiff's loss claim by June 5, 2007, well before the July 12, 2007 letter from defendant CSE to

25   plaintiff, and that Sams and Associates determined that his net claim was $6,792.41.  Moreover,

26   /////

36

1    aside from the letters noted above, defendant CSE has submitted no evidence describing the form

2    and/or substance of its investigation into plaintiff's loss claim.

3            A defendant is entitled to summary judgment based on a genuine dispute over

4    coverage "only where the . . . record demonstrates the absence of triable issues . . . as to whether

5    the disputed position upon which the insurer denied the claim was reached reasonably and in

6    good faith." Wilson, 42 Cal.4th at 724.   "'[A]n insurer cannot reasonably and in good faith deny

7    payments to its insured without thoroughly investigating the foundation for its denial.'" Safeco

8    Ins. Co. of America v. Parks, 170 Cal. App.4th 992, 1003 (2009) (quoting Egan, 24 Cal.3d at

9    819.)

10           Here, viewing the evidence in the light most favorable to plaintiff, a reasonable

11   jury could find that defendant CSE failed to thoroughly investigate plaintiff's loss claim.

12   Accordingly, defendant CSE's motion for summary judgment as to plaintiff's breach of the

13   implied covenant of good faith and fair dealing claim should be denied.

14           D.   Intentional Infliction of Emotional Distress

15           Defendants State Farm and CSE also seek summary judgment in their favor on

16   plaintiff's fourth cause of action for the intentional infliction of emotional distress.  Specifically,

17   counsel for both defendants argue that the undisputed evidence before this court establishes that

18   they acted reasonably and, therefore, plaintiff cannot establish that they engaged in the required

19   extreme and outrageous conduct.  Moreover, defendants argue that as a matter of law plaintiff

20   cannot show that he suffered severe emotional distress as a result of their conduct.  (Def. State

21   Farm's Mem. Of P. & A. (Doc. No. 63) at 24-25; Def. CSE's Mem. Of P. & A. (Doc. No. 113) at

22   21-22.))

23           Under California law "[a] claim of intentional infliction of emotional distress

24   requires a plaintiff to show '(1) extreme and outrageous conduct by the defendant with the

25   intention of causing, or reckless disregard of the probability of causing, emotional distress; (2)

26   the plaintiff's suffering severe or extreme emotional distress; (3) and actual and proximate

causation of the emotional distress by the defendant's outrageous conduct.'" Pardi v. Kaiser
Foundation Hospitals, 389 F.3d 840, 852 (9th Cir. 2004) (quoting Cervantez v. J.C. Penney Co.,
24 Cal.3d 579, 593 (1979).  See also Hughes v. Pair, 46 Cal.4th 1035, 1050 (2009).  In order to
make a sufficient showing on the first prong of this test, plaintiff must show that the defendant's
conduct was "'so outrageous in character, and so extreme in degree, as to go beyond all possible
bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized
community.'"  Pardi, 389 F.3d at 852 (quoting Cochran v. Cochran, 65 Cal. App.4th 488, 496
(1998).  Thus, for example, an intentional infliction of emotional distress claim lies where an
insurer sends harassing letters to the claimant and makes false accusations, putting the claimant
in fear of unfounded litigation if the claimant does not drop the claim, Fletcher v. Western
National Life Ins Co., 10 Cal. App.3d 376 (1970), or where an insurer's investigator engages in a
romantic relationship with the claimant so that he could take photographs of her to compromise
her worker's compensation claim.  Unruh v. Truck Insurance Exchange, 7 Cal.3d 616 (1972),
overruled on other grounds by Cal. Labor Code § 3602.)

        Here, plaintiff has failed to present any evidence that either defendant State Farm
or defendant CSE engaged in extreme or outrageous conduct as defined under California law.
Instead, the undisputed evidence before the court on summary judgment establishes that plaintiff,
State Farm and CSE were merely engaged in a dispute over plaintiff's loss claims.  Even
assuming arguendo that both defendants should have promptly paid plaintiff for his loss under
their policies, and that defendant CSE failed to properly investigate plaintiff's claim, plaintiff's
cause of action for intentional infliction of emotional distress would still fail, since neither
defendant engaged in conduct that could conceivably be characterized as extreme or outrageous.
See Isaacson v. California Ins. Guarantee Assn., 44 Cal.3d 775, 788-89 (1998) (allegation that
insurer refused to accept reasonable settlement offer failed to allege extreme conduct); Mintz v.
Blue Cross of California, 172 Cal. App.4th 1594, 1609 (2009) (allegation that health insurance
company denied benefits for an experimental treatment to a terminally ill patient and failed to

advise insured of right to independent review of the denial failed to state a cognizable claim for

intentional infliction of emotional distress ); Coleman v. Republic Indem. Ins. Co. of California,

132 Cal. App.4th 403, 417 (2005) ("California courts have held that delay or denial of insurance

claims is not sufficiently outrageous to state a cause of action for intentional infliction of

emotional distress"); Ricard v. Pacific Indemnity Co., 132 Cal. App.3d 886, 889-94 (1982)

(conduct not outrageous where insurer denied plaintiff's claim and accused plaintiff of "trying to

put something over on" insurer).

Accordingly, the motions for summary judgment as to plaintiff's claim for the

intentional infliction of emotional distress brought on behalf of defendants State Farm and CSE

should be granted.

E.   Punitive Damages

Next, defendants State Farm and CSE seek summary judgment in their favor with

respect to plaintiff's claim for a punitive damages.  Specifically, counsel for defendants argue

that the undisputed evidence before the court on summary judgment neither defendant engaged in

conduct demonstrating fraud, oppression, or malice.  Defendants argue that the mere fact that

they investigated plaintiff's claims and then denied payment of those claims does not evidence

malicious, fraudulent or oppressive conduct and that such conduct is required to support an

award of punitive damages.  In opposing defendants' motions for summary judgment in this

regard, plaintiff argues that the defendants' unreasonable delay, failure to investigate, and

withholding of payment was malicious, fraudulent and oppressive.  (Def. State Farm's Mem. Of

P. & A. (Doc. No. 63) at 26-28; Pl.'s Opp.'n. to State Farm (Doc. No. 93) at 31; Def. CSE's

Mem. Of P. & A. (Doc. No. 113) at 22-23; Pl.'s Opp.'n. to CSE( Doc. No. 115) at 33-34.))

"Punitive damages are not given as a matter of right, nor can they be made the

basis of recovery independent of a showing which would entitle the plaintiff to an award of

actual damages." Cheung v. Daley, 35 Cal. App.4th 1673, 1675 (1995).  Moreover, under

California law, punitive damages are not recoverable based on the defendant's breach of contract.

1   See Brewer v. Premier Golf Properties, 168 Cal. App.4th 1243, 1251 (2008); see also Major v.

2   Wester Home Ins. Co., 169 Cal. App.4th 1197, 1224 (2009) ("punitive damages are not

3   authorized in contract actions under California law").  Accordingly, plaintiff 's breach of contract

4   claim against defendants State Farm and CSE will not support a claim for punitive damages.

5          However, punitive damages are available for a breach of the implied covenant of

6   good faith and fair dealing claim where a plaintiff can show that the defendant "not only denied

7   or delayed the payment of policy benefits unreasonably or without proper cause, but, in doing so,

8   was guilty of malice, oppression or fraud." Jordan v. Allstate Ins. Co., 148 Cal. App.4th 1062,

9   1080 (2007).  In order to obtain punitive damages on such a theory, plaintiff must prove that the

10  defendant engaged in malice, oppression, or fraud by "clear and convincing evidence."  Cal. Civ.

11  Code § 3294(a); Roby v. McKesson Corp., 47 Cal.4th 686, 712 (Cal. 2009); Jordan, 148 Cal.

12  App.4th at 1080.  The "clear and convincing evidence" standard applies both at trial and at

13  summary judgment.  Gathenji v. Autozoners, LLC, 703 F. Supp.2d 1017, 1036 (E.D. Cal. 2010);

14  Spinks v. Equity Residential Briarwood Apts., 171 Cal. App.4th 1004, 1053 (2009).

15          In this context, "Malice" is defined as intentional injury or "despicable conduct

16  which is carried on by the defendant with a willful and conscious disregard of the rights or safety

17  of others."  Cal. Civ. Code § 3294(c)(1); Roby, 47 Cal.4th at 712.  "Oppression" is defined as

18  "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of

19  that person's rights."  Cal. Civ. Code § 3294(c)(2); Roby, 47 Cal.4th at 712.

20          Here, viewing the evidence in the light most favorable to plaintiff, there is no

21  evidence (let alone clear and convincing evidence) before the court suggesting that defendant

22  CSE engaged in malicious, oppressive, or fraudulent conduct.  Even assuming arguendo that

23  defendant CSE failed to thoroughly investigate plaintiff's loss claim and thereby delayed

24  payment on that claim, that would merely establish that defendant CSE violated the duty of good

25  faith and fair dealing.  However, a mere violation of the duty of good faith and fair dealing is by

26  itself insufficient to support a punitive damages claim.  Silberg v. California Life Ins. Co., 11

Cal.3d 452, 462-63 (1974); Jordan, 148 Cal. App.4th at 1080; see also PPG Industries, Inc. v. Transamerica Ins. Co., 20 Cal.4th 310, 319 (1999).

With respect to defendant State Farm, the court has already determined that summary judgment is appropriate in its favor as to plaintiff's bad faith claim. "If the insurer did not act in bad faith, punitive damages are unavailable . . . ." American Cas. Co. v. Krieger, 181 F.3d 1113, 1123 (9th Cir. 1999); Lundsford v. American Guarantee & Liability Ins. Co., 18 F.3d 653, 656 (9th Cir. 1994).

Accordingly, for the reasons stated above, the motions for summary judgment brought on behalf of defendants State Farm and CSE with respect to plaintiff's punitive damages claim in connection with his breach of contract claim against both defendants and with respect to his breach of the implied covenant of good faith and fair dealing claim against defendant CSE should be granted.

### REMAND OF REMAINING STATE LAW CLAIMS

As noted above, plaintiff originally commenced this action by filing a complaint in the Sacramento County Superior Court on January 12, 2009. (Doc. No. 2 at 4.) On April 21, 2009, defendant Mediterranean Shipping Company (MSC ) removed the action to this court pursuant to 28 U.S.C. § 1441(a). (Doc. No. 1.) If these findings and recommendations are adopted, all claims against defendant MSC will be dismissed. Moreover, plaintiff's remaining causes of action against defendants State Farm and CSE are undisputedly state law claims. Under such circumstances, it has been recognized as follows:

> When removal is based on the presence of a federal cause of action, a district court may remand the pendent or supplemental state law claims to the state court once the federal claims have been eliminated. See Lee v. City of Beaumont, 12 F.3d 933, 936 (9th Cir.1993). In fact, "it is generally preferable for a district court to remand remaining pendent claims to state court." Id. at 937.

Dean v. City of Fresno, 546 F. Supp. 2d 798, 821 (E.D. Cal. 2008). See also 28 U.S.C. § 1367(c) (a district court "may decline to exercise supplemental jurisdiction . . . [if] the district

1    court has dismissed all claims over which it has original jurisdiction.")  The court's discretion to

2    decline jurisdiction over state law claims is informed by the values of judicial economy, fairness,

3    convenience, and comity.  Acri v. Varian Associates, Inc., 114 F.3d 999, 1001 (9th Cir. 1997).  In

4    addition, "[t]he Supreme Court has stated, and [the Ninth Circuit] ha[s] often repeated, that 'in

5    the usual case in which all federal-law claims are eliminated before trial, the balance of factors

6    . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'"

7    Acri, 114 F.3d at 1001 (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7

8    (1988)).

9          Here, the undersigned finds insufficient justification for the disregarding of the

10    Supreme Court's warning that the balance of factors normally points toward the federal court

11    declining to exercise jurisdiction over pendent state law claims after all federal claims have been

12    eliminated from a complaint.  Carnegie-Mellon Univ., 484 U.S. at 350 n. 7.  Considerations of

13    comity obviously weigh heavily in favor of remand.  Convenience and fairness do not weigh in

14    favor of the case remaining in federal court since the Sacramento County Superior Court is just

15    blocks away from this court, is equally convenient to the parties and is equally capable of

16    providing a fair adjudication of the matter.  While concerns of judicial economy might normally

17    tip slightly in favor of the exercise of federal jurisdiction, where as here the court has heard and

18    resolved several pretrial motions to reach this point, that slight tipping of the scales is more than

19    balanced by this courts well-documented, overwhelming caseload.

20          If these findings and recommendations are adopted all federal claims will have

21    been resolved and only state law claims will remain.  The undersigned also recommends that, in

22    an exercise of discretion, this action with its remaining state law claims be remanded to the

23    Sacramento County Superior Court.

24    /////

25    /////

26    /////

CONCLUSION

For all the reasons set forth above, IT IS HEREBY RECOMMENDED that:

1.  Defendant Mediterranean Shipping Company's January 10, 2011 motion to dismiss (Doc. No. 104) be granted;

2.  Defendant State Farm's September 14, 2010 motion for summary judgment (Doc. No. 80) be denied as to plaintiff's breach of contract claim;

3.  Defendant State Farm's September 14, 2010 motion for summary judgment (Doc. No. 80) be granted in all other respect;

4.  Defendant CSE's February 28, 2011 motion to dismiss (Doc. No. 113) be denied;

5.  Defendant CSE's February 28, 2011 motion for summary judgment (Doc. No. 113) be denied as to plaintiff's breach of contract claim;

6.  Defendant CSE's February 28, 2011 motion for summary judgment (Doc. No. 113) be denied as to plaintiff's breach of the implied covenant of good faith and fair dealing claim;

7.  Defendant CSE's February 28, 2011 motion for summary judgment (Doc. No. 113) be granted in all other respects;

8.  That this action, with its remaining state law claims be remanded to the Sacramento County Superior Court; and

9.  That this action be closed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are

1   advised that failure to file objections within the specified time may waive the right to appeal the

2   District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

3   DATED: May 11, 2011.

4

5

6                                                                DALE A. DROZD
                                                                 UNITED STATES MAGISTRATE JUDGE
7   DAD:6
    diamond1110.msj.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26